Dillon, J.
The state of Ohio sues the defendant on a bond in the sum of $20,000 with interest at the rate of 2% per cent, per annum from February 3, 1908, to May 16, 1908, with interest at the rate of 6 per cent, per annum from said last named date.
The petition alleges that this bond was given pursuant to the State Depository law, being the act 97 O. L., 535 (General Code, 321, et seq.), and that after giving said bond, securing the state from loss for money thereafter to be deposited in the Euclid Avenue Trust Company of Cleveland, Ohio, that the *187 state did so deposit the sum of $20,000 and the same was evidenced by three certificates of deposit, two for $5,000 each, dated September 10, 1906, and one for $10,000, dated December 10, 1904. The petition sets forth the terms of the bond, and a copy thereof is attached as an exhibit, and further alleges that the said Euclid Avenue Trust Company made an assignment for the benefit of its creditors; that demand for payment has been made upon the assignee and also upon the defendant surety company, which has been refused.
. The answer of the defendant is made up of a number of facts alleged along with a great many legal conclusions stated. These various answers and legal conclusions have been ignored by any motion or demurrer, but the state has filed a brief reply setting forth, among other things, that by virtue of an agreement between the plaintiff and defendant a dividend of 50' per cent., declared and paid by the assignee, has been received by the state without prejudice.
Notwithstanding the fact that irrespective .of the decision in this case the legal questions presented. will be taken to the higher courts for review, this court has deemed it its duty to take full time and consideration for decision. The trial was originally before a jury, but at the conclusion of all the evidence each side moved that the court direct a verdict and enter judgment in its favor. Whereupon the court discharged .the jury and reserved the case for this decision.
The facts in the ease are brief. Prior to the passage of the depository act above mentioned, it was, according to law, a conversion and embezzlement for a state treasurer to take any money away from the treasury and deposit it in any bank. In spite of this, however, for some time prior to the passage of this act, the state treasurer surreptitiously and by connivance with one Craft, a close political friend and president of the Euclid Avenue Trust Company, took from the state treasury, and therefore, as a matter of law, converted and embezzled the sum of $50,000 and handed the same over to the Euclid Avenue Trust Company by an arrangement whereby he, the said state treasurer, in his individual capacity, should receive the usufruct therefrom by way of interest.
*188 After the passage of this act, it was desired by these parties, the said treasurer now acting in his official capacity and not as an individual, to continue this deposit under the new law and to restore to the state of Ohio the money thus previously convert'ed and on deposit in this bank. In just what name the state treasurer had been depositing this $50,000, I do not believe is disclosed. But for the purpose of carrying out this desire to restore this converted money to the state in his official capacity, the arrangement was first made with the defendant company whereby it entered into a bond with the state together with the Euclid Avenue Trust Company, reciting that, whereas, the said Euclid Avenue Trust Company has been duly designated and approved as a state depository under the act aforesaid, and that, whereas, the said Euclid Avenue Trust Company had been designated under the law as one of the depositories and had been selected by the treasurer of the state of Ohio, and that said treasurer of state had agreed to deposit moneys of the state of Ohio in accordance with said act; therefore, “if the said the Euclid Avenue Trust Company shall pay over to the treasurer of state for the use of said state of Ohio upon demand made therefor or upon his written order any and all moneys which from time time hereafter may come into the custody of said the Euclid Avenue Trust Company under and by virtue of said act, ’ ’ etc., then this obligation shall be void, otherwise to remain in full force and effect.
The defendant has set forth nine grounds or headings in its-brief why the defendant is not liable in this case. I do not agree with any of these grounds except one, which I will discuss last. So far as the knowledge of the state treasurer is knowledge of the state in this case, I agree with counsel for the defendant. The board of deposit, which is created by the act aforesaid, consisted of Treasurer of State, who was chairman, the Auditor of State and the Attorney-General, and their sole duty was* to meet on the first Monday in October of each year or any time afterwards upon the call of the chairman and designate such banks and trust companies within the state as would be eligible to be made state depositories and to stamp all applications either approved or re *189 jeeted. The function of this board ceased with this work, and the statute, by Section 4 thereof (General Code, 326), gave to the Treasurer of State the discretion and right to deposit any portion of the public moneys in his possession in any such designated bank which had been thus approved by the board. In dealing, therefore, with a bank and a surety company, the knowledge of the treasurer is chargeable to the state and the state, therefore, is incapacitated by any legal omission or commission with reference to its dealings with the bank the same as an individual, having reference, however, to the various provisions of the act in question, of which, of course, the parties must take notice.
' The defendant makes a claim that it is released by the negligence of the board of deposit in not meeting, as provided by General Code, 323, a second time and passing upon the qualifications, responsibility, etc., of this Euclid Avenue Trust Company. My interpretation of this act is that the board did not have to re-designate or re-examine a bank, that the act did not go so far • as to require continuous supervision; but that once having been designated, the discretion was solely with the treasurer to watch these banks and to rely upon his own judgment or that of the surety with reference to the future. The weakness of the act in this case is no excuse for judicial legislation or for the extension of interpretation. The argument which the state has so ably presented on this point I adopt as my opinion here.
Likewise, without going into detail, the court adopts the view stated by counsel for the state with reference to the claim that these funds were noLpublic funds; that the state forms a part of the bond is true only in part. That part of the statute (General Code, 327) which relates to the lending of the money and the giving of the bond and the manner thereof is a part of the bond, but those parts of this act which are directory to the board of deposit and which could not in any way affect hazard or risk of the surety company will afford it no relief. That a bond given is not retrospective and that the state appearing in the courts is bound by the same rules as a private person and is shorn of its sovereignty can not be seriously disputed. This court also adopts *190 the argument in full presented by the state that no renewal of this bond was necessary. ' Whatever may have been in the mind of the Legislature in providing for a bond, and whatever reasons might actuate us to see the necessity for a time limit upon the bond, the fact is that the bond was unlimited, and the act, if defective in this respect, can not be aided by any strained or unnatural interpretation.
The defendant has further argued that a demand on the principal must be averred in the petition and proven. The decision of my associate, Judge Rogers, on this point, is not only conclusive upon this branch of the court but meets with the approval of this branch of the court.
The one point which has caused this court long and serious consideration and conflicting opinions, pro and con. has been the relation of the surety bond to the peculiar nature of this deposit. The total sum of money which the Treasurer of State had previously converted and deposited in his own name in this bank was $50,000. The evidence conclusively shows that this $20,000 was a part thereof. If this money, previously deposited, is to be viewed and considered as the state’s money in the sense that it was money of the state exclusively, then this money clearly was already deposited and could not possibly come within the terms of the bond which could only apply to money deposited after the giving of the bond. But as a matter of law I think we must hold, and on this point I do not think there can be much contention, that the state’s only interest in it was that of any other owner of money which had been converted. It could impress its trust upon it and follow it, but as a matter of fact it was converted with the intention, of course, of paying it back to the treasury. The argument is very strongly made and ably presented that by this subsequent issue of the certificates of deposit for $20,000 of this embezzled money the treasurer as an individual restored to the state in proper and legal form the money he had previously converted and which had already been on deposit there; that he had the option of either taking the money in physical form back to the state treasury and then making another trip back to Cleveland and depositing it in the proper form as it was, or do so' di *191 rectly, and I think this view so far is correct. In other words, disregarding mere form, this $20,000 was properly restored to the state on the dates when the certificates of deposit were issued in the form required by the new act. So far, therefore, the solution of the question would be in favor of the state’s revovery in this ease as against the Euclid Avenue Trust Company, for no other person after those dates had any title whatever to this money.
The difficulty, however, and the question which has caused much conflict, has been the relationship of the surety to this state of facts. Even if we go so far as to say that this money thus restored to the state by the change in the form of deposit might be construed as money “hereafter deposited” within the meaning of the bond, the circumstances are such as would release the surety. Since we are to measure the law in this respect not by the amount of money or amount of risk, great or small, as influencing a surety and as affecting his rights under the general law of suretyship, but must measure it by principle, it must be conceded that there were at least three important elements in which a surety’s rights have been infringed. A surety in assuming a risk is, by well-settled law, entitled to know and be informed of any moral delinquency on the part of the risk which ought to be communicated to him and which would have a natural tendency to affect his going or not going upon the bond. This doctrine has been laid down in the state of Ohio in two very strong cases. In the case of Smith v. Josselyn, 40 Ohio St., 409, a principal had knowledge that his agent, by culpable carelessness, had lost money collected by him in the discharge of his duties and for that reason required that he give bond. The same was given, but the principal did not inform his sureties of his agent’s former culpable carelessness and having no knowledge thereof, it was held that the principal could not avail himself of the guarantee thus obtained. Again, in the case of Dinsmore v. Tidball, 34 Ohio St., 411, a principal having a belief founded on reasonable information that his agent was a defaulter, required sureties for his fidelity in the future, holding him out as a trustworthy person. Again, it is held that such *192 principal could not avail himself of the guarantees so obtained from the person who was ignorant of what was known to the principal, and which ought to have been disclosed by him to the surety.
The principle above announced is a general one, and it is unnecessary to burden this opinion with further citations. The séeret connivance, therefore, between this bank and the treasurer whereby so large a sum of money as is involved in this case was and had been for a long time converted, was a fact which it would seem the treasurer acting for the state and having full knowledge thereof should have communicated.
‘.But if we consider this first propostion one of doubt, we come to the second and third propositions, which are, first, that a bond of such a character as this means before any liability can accrue upon it that there is to be an increase in the deposit and therefore an increase of strength on the part of the risk and a consequent diminution of the liability; and, second, the right which a surety has of relying upon such an increase in deposits by the acquisition of increased funds so that the bank has more after incurring the liability than before. Thus, it is easily conceded that a surety company might go on a bond for $100 to a bank which had a deposit of only $100,000 on the theory that on the giving of such bond its liability is lessened by reason of the fact that the bank is thus strengthened to double its former condition. In other words, this surety company was becoming a surety for more money, not for secret money already deposited. The defendant had the right and could only presume that no such deposit could have been made prior to the giving of this bond or the passage of the law.
Consistently, therefore, with two most strongly established principles, first, that sureties can only be held within the strictest wording of their liability, and secondly, that principals dealing with sureties are bound to the very maximum of good faith, the opinion of this court is that the plaintiff can not recover, and a judgment will be entered for the defendant for the costs.